IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SAVE ARNOLD CANAL, an Oregon
Non-Profit Corporation, R. MARK ELLING;
JEROME RUDLOFF; DEBRA RUDLOFF;
RALPH H. EMERSON III,

        Plaintiffs,

  v.

ARNOLD IRRIGATION DISTRICT;
RONALD ALVARADO, in his official capacity as
State Conservationist, Natural Resources
Conservation Service, United States Department
of Agriculture; and NATURAL RESOURCES
CONSERVATION SERVICE, a federal agency
of the United States Department of Agriculture,

        Defendants.
_____

Case No. 6:22-cv-01462-MK

OPINION & ORDER

**MCSHANE, Judge**:

    Plaintiffs are property owners and a nonprofit corporation wishing to preserve the irrigation canals that run through their property in Central Oregon. Plaintiffs argue: "Piping the Arnold Main Canal would eliminate a century-old dependence of seasonal water by local wildlife, vegetation, trees, and aesthetic enjoyment by the residents of the canal." Pls.' Memo. 29, ECF No. 50. To that end, they seek a preliminary injunction that would halt implementation of the Arnold Irrigation

1 – OPINION AND ORDER

District Infrastructure Modernization Project ("The Project"). The Project will replace the open-air canals with 48-60-inch high-density polyethylene piping.

Plaintiffs contend that the Natural Resources Conservation Service ("NRCS") and Ronaldo Alvardo (collectively, "Federal Defendants") have violated the National Environmental Policy Act ("NEPA"). Next, they allege that the Arnold Irrigation District ("Irrigation District") is violating state law related to private nuisance and permissible right of way. Because Plaintiffs have not established the likelihood that they will succeed on the merits of their claim, that an injunction is in the public interest, or that the balance of equities tips in their favor, Plaintiffs' Motion for Preliminary Injunction, ECF No. 50, is DENIED.

## FACTUAL BACKGROUND

The Project is a joint effort between the Irrigation District and the NRCS. In June 2021, the NRCS issued a draft environmental assessment ("EA") and invited public comment. In August 2022, the NRCS published a final EA examining the Project. AR-00015-166. Later that month, the NRCS issued its Finding of No Significant Impact ("FONSI") regarding the Project. AR-0001-5. The FONSI constituted "final agency action" subject to this Court's review. Admin. Procedure Act ("APA"), 5 U.S.C. § 704.

"The purpose of this project is to improve water conservation in District-owned infrastructure, improve water supply management and delivery reliability to District patrons, and improve public safety on up to 11.9 miles of the District-owned Main Canal." AR-00024. The EA provided additional background on why piping would help the Irrigation District meet its goal of supplying sufficient amounts of water to meet the needs of its patrons:

> Aging infrastructure, growing population, shifting rural economies, and changing climate conditions have increased pressure on water resources across the western United States. Within the Deschutes Basin, irrigated agriculture is the main out-of-

> stream water use and relies on primarily 100-year-old infrastructure to divert, store, and deliver water to farms and ranches. In recent years, the improvement of water resources has been a coordinated focus among the eight irrigation districts within the Deschutes Basin, with the goal of addressing environmental needs for instream flows while still delivering enough water to district patrons.
>
> Arnold Irrigation District (herein referred to as AID or the District) operates 39 miles of canals and laterals in the Deschutes Basin. Most of this infrastructure consists of open, earthen canals. AID's Main Canal loses up to an estimated 32.5 cubic feet per second (cfs) of water during the irrigation season (11,083 acre-feet annually) due to seepage into the porous volcanic geology and evaporation. This water never reaches District patrons and farms.
>
> Over the years, AID has pursued infrastructure upgrades to provide a permanent solution to system-wide water losses. Although some improvements have been made, aging and outdated infrastructure continues to contribute to water delivery insecurity for out-of-stream users and limits streamflow due to the need to divert more water than is delivered; this affects water quality and aquatic habitat along the Deschutes River. The Main Canal has become a public safety risk to more people as the surrounding areas have urbanized. Aging infrastructure also affects the financial stability of AID and its patrons as AID must find new approaches to fund growing maintenance needs.
>
> Improving irrigation infrastructure offers an opportunity to conserve water, increase the reliability of water delivery to patrons, enhance streamflow and habitat conditions for fish and aquatic species in the Deschutes Basin, reduce risks to public safety from open irrigation canals, and reduce operation and maintenance (O&M) costs for the District.

AR-00029.

Plaintiffs moved for injunctive relief on July 25, 2023, and the matter is now fully briefed. The Court presided over an oral argument on August 22, 2023. Barring a court order enjoining activity, work on the Project is set to begin as soon as September 1, 2023.

## STANDARDS

A plaintiff seeking a preliminary injunction must establish: (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When there are "serious questions going to the merits," a court may still issue

3 – OPINION AND ORDER

a preliminary injunction when "the balance of hardships tips sharply in the plaintiff's favor," and the other two factors are met. *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). The Court's decision on a motion for a preliminary injunction is not a ruling on the merits. *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

## DISCUSSION

### I. MERITS OF PLAINTIFFS' NEPA CLAIMS

Agency decisions under NEPA are reviewed by this Court under the APA. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176 (9th Cir. 2011) (per curiam). Under the APA, a court's review of an agency decision should be searching but narrow, and the reviewing court should take care not to substitute its judgment for that of the agency. *Oregon Wild v. United States*, 107 F. Supp. 3d 1102, 1109 (D. Or. 2015) (citing *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). Under this review, the Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. An agency decision made without adherence to required procedure is not in accordance with law. *Id.*; *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 567 (9th Cir. 2000).

NEPA claims are reviewed under the "arbitrary and capricious" standard of the APA. *Ctr. for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1005 (9th Cir. 2011) (quoting 5 U.S.C. § 706(2)(A)). This reviewing standard is "highly deferential, presuming the agency action to be valid" and the Court "may only set aside decisions that have no basis in fact . . . not those with which [the Court] disagree[s]." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (quotation omitted); *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d

1089, 1099 (9th Cir. 2003). As explained by the Supreme Court, an agency action is arbitrary and capricious only:

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., Inc.*, 463 U.S. 29, 43 (1983).

As discussed below, Plaintiffs argue that, for a variety of reasons, the NRCS's decision was arbitrary and capricious and therefore violated NEPA. Especially when viewed under the "highly deferential" standard for NEPA claims, the Court disagrees.

**A. EA Review of Project Alternatives**

Plaintiffs argue that the EA failed to include viable alternatives to the piping alternative. The Court reviews the NRCS's "range of [NEPA] alternatives under a 'rule of reason' standard that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th Cir. 1998). Important here, the NRCS's "obligation to consider alternatives under an EA is a lesser one than under an EIS."[1] *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008). For an EA, it must include "a brief . . . discussion of alternatives" because the EA is "a concise public

---

[1] Plaintiffs' argument that the NRCS should have prepared an EIS due to the Project's impact on groundwater levels is meritless. "Agency decisions deserve the highest deference when 'the agency is making predictions, within its area of special expertise.'" *Ctr. Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (citation omitted). Predictions regarding future groundwater levels are within the NRCS's area of expertise. Noting the impact on local groundwater wells was uncertain was not arbitrary or capricious. As noted by the agency, groundwater data are only available at the basin-wide level and there is ample evidence that actions other than piping was responsible for groundwater reduction. AR-00183, AR-00186 (noting nearby piping projects did not result in nearby wells running dry and noting factors other than piping were to blame for wells near open-air canals running dry).

document." 40 C.F.R. § 1508.9. There is no requirement that an EA must discuss *why* an alternative was eliminated from detailed study. 40 C.F.R. § 1502.14(a).

The EA briefly noted several alternatives that were rejected early in the formulation process that did not meet the Project's purpose and needs. AR-00079 (rejecting voluntary reductions of water, conversion to dryland farming, and a mix of piping and open canal). While the Property Owners argue that the dismissal of these alternatives was arbitrary and capricious, the Court disagrees. The EA clearly states the above alternatives were not considered "because they did not meet the formulation criteria." AR-00079. While Plaintiffs argue the formulation criteria—specifically, the Project's concern with public safety issues—is itself invalid, that argument is meritless (as discussed below). Additionally, the EA contained an appendix which discussed in greater detail the reasons for not considering the above alternatives. AR-00221-28. This eight-page analysis clearly satisfies the APA.

Ultimately, while Plaintiffs are particularly aggrieved with NRCS's decision not to implement the canal lining alternative, the agency adequately considered this alternative. Although the EA was not required to explain why the canal lining alternative "was not analyzed in detail as a viable alternative," the EA contained a rather robust discussion backing up the decision to not consider that alternative in greater detail. AR-00079-81. The EA noted this alternative involved reshaping the canal and then placing a geomembrane liner over the bottom and sides of the canal. AR-00079. This alternative "would increase water velocity" due to the smoother lining. AR-00080. Notably, this alternative would likely be *more dangerous* than the current canal:

> The smoother surface would make the sides of the canal slippery, and the increased water velocity and decreased friction could make it and [sic] more difficult for anyone who might accidentally fall in the water to be able to climb out.

AR-00080.

6 – OPINION AND ORDER

Plaintiffs also argue the EA "arbitrarily dismissed canal lining as an alternative" because it sharply contrasts with a 2019 Bureau of Reclamation ("BOR") report studying canal lining. Pls.' Memo. 34-35. That report stemmed from a 25-year study of various canal linings in the Irrigation District. Plaintiffs note the report "found that concrete over geomembrane and concrete alone had durability lasting over 50 years, and those sections found to be in "excellent" condition." *Id.* (citing AR-05454; AR-05466-68. Plaintiffs continue:

> Quizzically, in response to public comments FCA attempted to reconcile the draft Plan-EA's claims that the test sections in the BOR's study were failing, AID responded that all of the test sections were "fair to poor" and an unexplained "accelerated degradation of shotcrete mattress." AR-02138-41; AR-02144. These doomsday observations by piping's main proponent contradict very recent studies prepared by BOR with the opposite conclusion.
>
> In reliance upon this implausible explanation of "accelerated degradation" Federal Defendants ascribed a 30-year life to the canal lining alternative, thereby tripling the net present value of the canal lining alternative by stating that it would need to be replaced in its entirety every thirty years. AR-00081; AR000238.

Pls.' Memo. 9.

Such a drastic departure from a recent agency report, without any supporting justification, would essentially be the textbook definition of an arbitrary and capricious action. Unfortunately for Plaintiffs, they ignore, intentionally or not, significant supporting justification contained in the EA. In fact, the EA's justification for not following the BOR report comes immediately after the portions of the EA cited by Plaintiffs. The EA discussed the BOR's canal lining Report. The EA noted the 2017 investigation revealed five sections of canal lining "were considered in excellent condition" 25 years after installation. AR-00080. After noting the 2017 Report did not examine the lining for seepage, the EA stated:

> However, in 2021, 30 years after lining installation, AID determined that the five lined sections considered to be in excellent condition in 2017 have degraded at an accelerated pace and that their lining is no longer effective at conveying water (see

7 – OPINION AND ORDER

> Appendix D.3 for photos of the existing lined sections). There is widespread cracking in the shotcrete above and below the waterline. In some areas, the shotcrete is broken in pieces, leaving the underlying membrane exposed. In other areas, there are holes in the exposed lining where silt and sediment has collected, forcing the lining upward and impeding the water flow in the canal. Many low-lying areas within these five lined sections do not retain water in the non-irrigation season; this indicates water loss due to seepage. AID determined that many test sections would require significant maintenance or complete replacement of the shotcrete and liner.
>
> Based on the findings from the Reclamation 25-year report and the AID's experience, the design life for the Canal Lining Alternative was estimated to be approximately 30 years. A 30-year design life would require full replacement of the geomembrane liner and shotcrete after every 30 years. These expenses would be the responsibility of the AID and its patrons and would likely exceed the AID's financial resources.

AR-00081.

Due to the high estimated costs of the canal-lined alternative, the EA eliminated that option from further study. AR-00081. Appendix D.3.2 contains photographs the Irrigation District took in October 2021. AR-00231. The photographs portray "existing canal lining sections in the District" that were part of the BOR's study. The photographs show all five test sections and clearly support the EA's conclusion that although the five sections were in "excellent condition" in 2017, they were each in need of repair by October 2021.

Failing to select Plaintiffs' preferred alternative is not arbitrary or capricious. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989) ("[NEPA] does not mandate particular results, but simply prescribes the necessary process."). Plaintiffs' argument fails because the EA "set forth . . . alternatives necessary to permit a reasoned choice." *Presidio Golf Club*, 155 F.3d at 1160. The EA satisfied NEPA's "obligations to consider alternatives" and the decision to not consider Plaintiff's preferred canal lining alternative in more detail was not arbitrary or capricious. *N. Idaho Cmty. Action Network*, 545 F.3d at 1153; 40 C.F.R. § 1502.14(a).

8 – OPINION AND ORDER

Finally, Plaintiffs take issue with the EA's analysis of the "no action" alternative. The regulations, however, *require* the EA to consider the no action alternative. 40 C.F.R. § 1502.14(c) ("the agencies shall . . . include the no action alternative."). The EA "include[d] a brief discussion of reasonable alternatives" and "considered and discussed" the preferred alternative alongside a no action alternative. NEPA does not require more. *N. Idaho Cmty. Action Network*, 545 F.3d at 1153-54.

### B. Drowning Risk

Plaintiffs argue:

> The addition of the "improving public safety" purpose criterion, particularly when the evidence shows a very low risk of drowning, demonstrates that the inclusion of the purpose criterion was designed to, and did, eliminate all but one alternative, making the EA a "foreordained formality." The purpose of public safety was an unreasonably narrow formulation meant to preordain the preferred alternative in violation of NEPA.

Pls.' Memo. 14-15, ECF No. 50-1 (internal citation and footnote omitted).

The Court reviews for substantial evidence and will "uphold [an agency's] findings unless the evidence presented would compel a reasonable finder of fact to reach a contrary result." *Monjaraz-Munoz v. I.N.S.*, 327 F.3d 892, 895 (9th Cir. 2003). As discussed in the EA, drowning in irrigation canals is a risk likely to be exacerbated by more people moving into Central Oregon. Piping these open waterways will eliminate that risk. AR-00039. The EA noted the "open Main Canal poses a risk to public safety. In addition to multiple instances of injury in the District, at least 10 deaths have occurred in other irrigation district canals near [Irrigation District] infrastructure (The Bulletin, 2014; KTVZ 2014; Chu 2004; Cliff 2008; Flowers 2004; Golden 2007; Minoura 2007)." AR-00039; *see also* AR-00206 (pointing to several specific instances of individuals drowning in Central Oregon irrigation canals over the past two decades and

9 – OPINION AND ORDER

concluding, "A history of recent drownings in Central Oregon irrigation canals provides evidence that fast-moving water in irrigation canals, often with steep and slippery banks, can be a threat to public safety."). As this Court found in rejecting a similar challenge to a similar modernization project, "[w]hile the Plaintiffs may disagree with the legitimacy of this [drowning] risk, it was still something NRCS could consider. It would have been surprising had they not. Because it was not arbitrary or capricious for the EA to address and consider the drowning risk posed by open canals, Plaintiffs argument under this theory fails." *Smith v. Tumalo Irrigation Dist.*, 500 F. Supp. 3d 1148, 1157-58 (D. Or. 2020) (internal citation omitted).

It is hard to imagine that Plaintiffs take seriously their public safety argument. Any child growing up around these canals (this writer included) heard the constant and consistent refrain from their parents to "stay the heck out of that canal." The Court needn't stress how obvious it is that any entity managing open irrigation canals has a duty to the public to protect children from drowning. In fact, the National Watershed Program Manual reminds agencies that they "must consider" "Public health and safety" when considering development of watershed projects. AR-08856. Additionally, "Public Safety" is a "Guiding Principle" the NRCS must consider "when developing and evaluating alternatives." AR-00268. "An objective of the [Principles, Requirements, and Guidelines for NRCS Watershed Programs] is to reduce risks to people including life, injury, property, essential public services, and environmental threats concerning air and water quality. These risks to public health and safety must be evaluated and documented for all alternatives . . . ."

Ignoring these requirements (and common sense), Plaintiffs first note that the NRCS was not required to specifically include public health and safety in its purpose and need statement. Pls.' Reply, 10. From there, Plaintiffs argue that because the NRCS included public safety in the

10 – OPINION AND ORDER

Project's purpose and needs, it violated NEPA. *Id.* The Court declines to leap to this same conclusion. As discussed above, there is abundant "support in the record" for the need to consider public safety regarding open canals. *Wild Wilderness v. Allen*, 871 F.3d 719, 729 (9th Cir. 2017). Additionally, it is abundantly clear that the public safety issue is not something the Irrigation District or NRCS concocted merely to "preordain" the decision to replace the open canals with underground piping. The Irrigation District submitted a 23-page "Otto Otter for Safe Canals Coloring Book." Johnson Decl. Ex. F, ECF No. 58. This *2012 public safety campaign*—sponsored by the U.S. Department of the Interior along with the Oregon Water Resources Congress several years before any plan to undertake the Project at issue—alerted parents of the need to warn their children, especially those children under the age of 14, "that canals can be very dangerous" and parents must "never allow your child to swim or fish in a canal or play near a canal bank." *Id.* at F 2. The book contained 20 pages for children to color with different age-appropriate messages explicitly warning children of the dangers of open canals. Plaintiffs' argument that considering public safety is some sort of sham ginned up by the Irrigation District to plow ahead with the piping plan is meritless.

## II.     MERITS OF PLAINTIFFS' STATE-LAW CLAIMS

Plaintiffs acknowledge, as they must, that the Irrigation District has "some form of easement" regarding the canals. Pls.' Memo. 22 n.9. As they clarified in oral argument, Plaintiffs ask the court to limit the scope of the easement to an open-air canal with running water. The Court, however, finds Plaintiffs have not demonstrated any likelihood of success in demonstrating that the easement is so limited. The parties agree that the canals at issue have operated for over 100 years. The parties agree the Irrigation District uses the canals to provide water to its patrons, including Plaintiffs themselves. This has been the sole purpose of the canals *for well over a*

11 – OPINION AND ORDER

*century*. The other nearby irrigation districts have easements "granted by the federal government over 100 years ago to provide irrigation to farms and ranches. *See* Pl.'s Mot. 39; Act of March 3, 1891, *as amended*, 43 U.S.C. § 946 (the Right of Way Act of 1891); Desert Land (Carey) Act of 1894, 43 U.S.C. § 641." *Smith*, 500 F. Supp. 3d at 1158; *Swalley Irrigation Dist. v. Alvis*, No. Civ. 04-1721-AA, 2006 WL 508312, *1 (D. Or. Mar. 1, 2006). Craig Horrell, Managing Director for Central Oregon Irrigation District, confirms other local irrigation districts rely on the same process relied upon by the Irrigation District to deliver water to their own patrons:

> I understand that the plaintiffs are contending that that [sic] Arnold Irrigation District's right of way under the Carey Act, 42 U.S.C. §§ 321-329, and the Right of Way Act of March 3, 1891 as it is related, never vested. From my experience and belief, this cannot be true.
>
> Irrigation districts throughout Central Oregon have relied on their Carey Act easements to deliver irrigation water to our patrons for a hundred years or more, and I understand that the Carey Act set forth a process which had to be followed for a patent to be issued, and for the irrigation companies' rights to vest. Included in that process was the submission of articles of incorporation, a map sowing the canals and laterals as constructed, and subsequent approval by the Secretary for the Department of the Interior of those submissions. If the process had not been followed correctly, it would not be possible for the Department of Interior and the State of Oregon to issue patents to settlers of the reclaimed desert lands, as provided for under the Carey Act. Thus, the fact that patents were issued for land along the Arnold Main Canal means that the "Carey Map" that Arnold Irrigation District relies upon, had to have been approved. My district engaged in the same process and relies on its Carey Act rights on a daily basis to operate our irrigation system on behalf of our patrons.

Horrell Decl. ¶¶ 3-4, ECF No. 56.

Unfortunately, the Irrigation District "has had at least two fires over the years that have destroyed almost all District historical records."[2] Johnson Decl. ¶ 8. Simply because the records at issue here appear to have been lost in a fire, the Court is not required to abandon common sense

---

[2] The Irrigation "does have a map, always referred to as the 'Carey Map' in its possession[.]" Johnson Decl. ¶ 8. Plaintiff concedes that "this does indicate that some lands may have been part of the Carey Act[.]" Pls.' Memo. 20.

12 – OPINION AND ORDER

in determining whether the easements were granted by the same federal and state laws used to create easements at the same time, and in the same manner as in other nearby irrigation districts. To be sure, for the past 120 years, the Irrigation District and the property owners have all been acting as if the easements were granted by those federal and state laws. *See* Johnson Decl. ¶ 4 ("Pursuant to the Carey Act and related federal and state legislation and easements, the District has diverted irrigation water from rivers and streams through canals and laterals to farms within the District's boundaries for over 100 years."). Plaintiffs have little likelihood of success on their claims that the easements arose from something other than the relevant federal and state laws enacted in the late 1800s and early 1900s. For that reason, and for the reasons outlined in *Swalley* and *Smith*, Plaintiffs' state claims have little likelihood of success.

But even if Plaintiffs manage to succeed on their arguments that the easements here differ from those found in every other nearby irrigation district, the Irrigation District would certainly have a prescriptive easement to provide water to its patrons. This is, after all, the purpose of "an Oregon Irrigation District organized under ORS chapter 545." Johnson Decl. ¶ 4. Updating the leaky canals to piping is consistent with how the Irrigation District has managed and improved the transfer of water—from simple dirt canals to shotcrete canals to geo-membrane lined canals with shotcrete overlay and finally to high-density piping—over the years:

> The District has operated, maintained and improved its overall water infrastructure for over 100 years. This has involved the building and replacement of flumes over rough and uneven lava terrain, the excavation and installation of several siphon pipes, piping several miles of laterals and the annual machine removal of silt from the bottom of canal and laterals and debris from the main canals and laterals.
>
> The fractured basalt geology of the Arnold area proves a challenge as it is very porous and is prone to sinkholes. It is very common for the District to experience [sic] the necessary repairs to fix sinkholes during the irrigation seasons. This requires the canal water to be shutdown, excavation down to necessary depths to then fill with specified material, and it is usually capped with shotcrete. It is often

13 – OPINION AND ORDER

> necessary to excavate high seepage areas along the canal berms where water seeps through the berm and begins flowing onto properties before the canal banks breach and flood homes and other property.
>
> \* \* \* \*
>
> District personnel access the Arnold Main Canal via its easements for construction, maintenance, safety, and improvement efforts.

Johnson Decl. ¶¶ 12-13, 16.

At minimum, the Irrigation District has held, for over 100 years, a prescriptive easement to provide irrigation to farms and ranches. As this Court concluded in *Smith*, and as Judge Aiken concluded in *Swalley*, upgrading irrigation from an open-air canal vulnerable to seepage to a pipe is consistent with the easement (express or prescribed) and does not overly burden the servient estate. *Smith*, 500 F. Supp. 3d at 1159-60; *Swalley*, 2006 WL 508312 at \* 2-4. "Legal activity by the dominant estate, even if it interferes with or impairs an owner's personal enjoyment, cannot support a private nuisance claim." *Smith*, 500 F. Supp. 3d at 1158) (quoting *Clark v. Kuhn*, 171 Or. App. 29, 33 (2000)). And as this Court found in *Smith*, upgrading the canal to piping is "reasonably necessary to accomplish the purpose" of providing water to its patrons. *Id*. at 1160 (quoting *Clark*, 171 Or. App. at 33). The Court finds Plaintiffs have little likelihood of success on their state claims.

### III.   OTHER FACTORS FOR PRELIMINARY INJUNCTION

As in *Smith*, the Court concludes Plaintiffs have arguably demonstrated a likelihood of irreparable harm[3] but the balance of equities tips in Defendants' favor. 500 F. Supp. 3d. at 1160-

---

[3] Much of the alleged harm comes in the form of decreased property values and loss of ponderosa pines. As described in Plaintiffs' exhibits, those harms have ascertainable dollar values. But the Court acknowledges the aesthetic harm to the properties at issue.

14 – OPINION AND ORDER

61. As the factors here mirror those in *Smith*, the Court adopts the findings and conclusions it made there. Similarly, the Court adopts the findings regarding the public interest:

> While the Court is sympathetic to Plaintiffs' concern about economic harm they face, the Court should still "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winters*, 555 U.S. at 24 (quotation omitted). The Federal Government and the Oregon Governor's Office jointly support the project. There is also plenty of evidence reflecting that the project will improve water quality and habitats for imperiled species in Central Oregon, which likely explains why no environmental-advocacy group has joined in this litigation. And as mentioned, the project will also eliminate the public safety concerns posed by open canals. In the end, Plaintiffs private interests are outweighed by the community's interest in having a safe and efficient irrigation system in the Deschutes Basin.

*Id.* at 1161.

## CONCLUSION

For the above reasons, Plaintiffs' Motion for a Preliminary Injunction, ECF No. 50, is DENIED.

IT IS SO ORDERED.

DATED this 24th day of August, 2023.

_____/s/ Michael McShane_____
**Michael J. McShane
United States District Judge**